134431 and 143116, Beeper Vibes Inc v. Simon Property Group Inc, et al. Argument not to exceed 15 minutes per side. Mr. Reiling, you can proceed for the appellant. Thank you, Your Honors. Good morning. Good morning. Mr. Reiling, on behalf of the appellant and cross-appellee, Beeper Vibes Inc. In this case, Your Honors, Beeper Vibes, an Ohio retail provider of... Was there a question, Your Honor? No, not yet. Probably just moving things around a little bit, but I really appreciate your attentiveness to any possible noise on our side. That's a wonderful way to start. You can keep going. Thank you. Beeper Vibes is an Ohio retail provider of cellular telephones and services, and it contends in this case that it was fraudulently induced by Simon and its subsidiaries to enter into six commercial leases at Simon Malls in southern Florida. As the fraudulent representations at issue in this case were made to Beeper Vibes at its offices in Ohio, and Beeper Vibes acted in reliance on those representations in part in Ohio, Beeper Vibes brought suit in the United States District Court for the Southern District of Ohio against the appellee seeking damages for fraudulent inducement under Ohio law. Mr. Reiling, this is Judge Sutton. Here's my question for you. What seems to me difficult about your side of the case is, if we accept that there were some statements about, we'll even call them commitments, quasi-commitments, about whether these other sellers were going to be there, it seems like you entered in, your client entered into all these contracts after knowing these other big dealers were going to be there or were already there or were on their way. So that's really hard for me to understand from the perspective of what your theory of the case would be. Your Honor, in regards to that issue, at the time of summary judgment, there was evidence before the court that Simon's representative, Mr. McMurtry, had actual knowledge that Best Buy Mobile, a major discount provider of cellular services, was entering into both the Boynton Beach and Coral Square Mall. There was evidence that Beeper Vibes specifically asked him for that information. He did not give it to them. Instead, he told them that he was not aware of any discount providers or other deals or other Verizon providers going into those malls, and Beeper Vibes relied on those representations. There's no evidence... But I thought there was evidence that Beeper Vibes signed each lease only after learning that Best Buy Mobile would be there or soon would be there. They did not know... The evidence at the time of summary judgment was that they did not know that Best Buy was entering into either the Boynton Beach or Coral Square Mall and only discovered that fact after opening the location at the mall. There's no evidence that they were aware that Best Buy Mobile was entering into either of those malls. And as the evidence... Counselor, this is Judge Stranch. Let me ask you. So you're making... Is there a distinction then between your entry into a business relationship and opening of the kiosk and the mall and the signing of the leases? I think Judge Sutton's question is that you signed the lease knowing that the competitors were in the malls. So how then can you claim fraudulent inducement if the actual signature on the lease was subsequent? The signatures... I think that that's a misunderstanding of the facts that were before the district court. The signatures on the leases were not made with knowledge that Best Buy Mobile had entered into either the Coral Square Mall or the Boynton Beach Mall. The signatures on those leases predated Beeper Vibe's entry into that mall and predated Beeper Vibe's discovery of the existence of Best Buy Mobile. So Beeper Vibe's did not undertake a business relationship and train its people and open its kiosks prior to signing the lease? That was my understanding. Am I incorrect? Starting in March of year 2010, Beeper Vibe's, after the representations by McMurtry, began their efforts to enter into the Florida market. Those efforts intensified after the execution of the lease. It wasn't until the locations were actually... the kiosks were moved into those two malls that Best Buy Mobile opened up nearly simultaneously to the opening of the Beeper Vibe's locations at both Boynton Beach Mall and Coral Square Mall. And the testimony, and I would direct the court to this, the testimony of Nathaniel Belvo, the vice president of Beeper Vibe's, and the testimony of Mr. Langford, who helped direct the Florida operations for Beeper Vibe's, is unequivocal on that point, that they discovered it after the leases were executed and after they were in the Florida market and were frankly somewhat horrified because the Best Buy Mobile locations were almost literally right on top of the Beeper Vibe's kiosks. And at that juncture, Best Buy Mobile was giving away the phones that Beeper Vibe's was attempting to sell as part of their promotions. There was no feasible way for Beeper Vibe's to compete with that kind of presence. Okay, counsel, we'll hear what your friend on the other side has to say about this timing issue. What about the fact that the contract itself has a merger clause, integration clause, whatever you want to call it? What's your response to that? Well, first of all, the argument depends on whether we apply Ohio law or Florida law. In regards to Ohio law, when fraud enters into the actual making of the contract, the fraud cannot be vitiated by or excluded from the reach of law by any formal phrase inserted into the contract itself. And in the brief on page 41, we cite the Niehaus case in support of that proposition. The court applied Florida law and under Florida law, in the event that there is an integration clause, that directly deals with the issue, then there's some difficulties on our side. But as we pointed to the court in our reply at page 10, we believe that under Florida law, and especially with reference to the Metrologic case decided by the Southern District of Florida, that it's clear in Florida that an integration clause does not cloak defendants with immunity for fraudulent statements. This is Judge Sallert. Isn't Florida law split on this issue? There are cases in both directions on the integration clause, right? There are, Your Honor. There's some cases that are stronger in regards to the integration clauses than others, but, again, I think that the most analogous case that we were able to locate, at least, was the Metrologic case, which, again, we cite in the reply, which clearly holds that in the event that representations are made, those representations are relied on, that there's not specific language in the lease addressing that issue that a claim for fraudulent inducement can proceed even in the face of an integration clause. And in this case, like the Metrologic case, the appellant has alleged that McMurtry made false representations concerning the existence of competitors, a subject that was unaddressed by the leases, and did not concern the performance of the parties under the lease. Obviously, this information was extraordinarily important to be provided, and appellees questioned that, but, nevertheless, at the summary judgment stage, the level of importance of this information is a factual issue that should have been decided by the trier of fact. Counselor, this is Judge Stranch. Let's assume that, well, actually, I think you are in one of the Florida districts that might preserve a fraudulent inducement claim. My notes are that it was the 1st, 2nd, and 3rd district have cases that indicate that fraudulent inducement may be retained as a cause of action. If that's the case, what is your strongest evidence that there is a dispute of material fact regarding the fraudulent inducement claim? Well, Your Honor, in regards to that issue, there is testimony in this case that McMurtry made representations to both Belvo and Langford at Beeper Vibes Ohio offices indicating the alleged nonexistence of any deals or other Verizon dealers or discount dealers entering into the market. McMurtry testified at deposition, as indicated in the brief, that contrary to his representations to both Belvo and Langford, he was actually aware as soon as fall of year 2009 that Best Buy Mobile was entering into the market. And in fact, by March of year 2010, he had actual knowledge that in regards to both of his malls, the Coral Square Mall and Boynton Beach Mall, that Best Buy had concluded its negotiations with Simon and was entering into those malls. Is there a dispute about whether he was asked those questions? There is a factual dispute. He indicated during the course of his deposition that he did not recall whether Belvo or Langford made those representations. Both Belvo and Langford obviously offered testimony to the contrary that he had in fact made those representations and they had relied on those representations going forward. There's also an email from March of year 2010 which has been included in the appendix which clearly sets forth Beeper Vibes' criteria for entering into the malls which lays out the fact that they don't want to go into a mall. Mr. Reiling, Judge Trantz has one other question and then this will be it for your initial argument. We're well past the red light. So Judge Trantz has another question. My only other question was what writings are in the record regarding your request for that information? In the record itself, we have the email from March year 2010 and during my rebuttal I'll give you the exact location of that. Are there any other writings? There are not, Your Honor. Okay, thank you. Okay, so we'll hear from Mr. McMillan. May it please the Court. My name is Ron McMillan and I represent the defendants' appellees and cross-appellants. Ladies and gentlemen, this appeal marks the end of four years of attempts by the appellant Beeper Vibes to avoid his contractual obligations to my client that began in November 17, 2010 when Mr. Beldo, the vice president of Beeper Vibes, decided to vacate the Florida market and abandon these kiosks. Mr. McMillan, why don't we start with this first question of the timing of the alleged commitments by your clients and then the timing of the signing of the contracts. Of course, Your Honor. The story that Beeper Vibes presented to the Court on summary judgment was that there were discussions that were had between Mr. Beldo and Mr. McMurtry in early March of 2010. Now, Mr. Reiling just pointed you to some deposition testimony from Mr. McMurtry, but it was severely mischaracterized. I have the testimony in front of me. In being asked about the Best Buy negotiations, Mr. Reiling, who took Mr. McMurtry's deposition, asked him, you knew they were ongoing as of March of year 2010, but you didn't know the current status of them at the time. Is that fair? And Mr. McMurtry's response was, that's a fairly accurate statement, aware of, but not a party to. It's important because even though the district court presented the dismiss the fraud claim based on the merger clause, there was no fraud here, nor was there, there was no fraudulent misrepresentation, and there was no justifiable reliance. And the reason I say there was no justifiable reliance relates to the first question about the timing. The story that Beeper Vibes presented was that they had these discussions in March of 2010. There was one email referencing other Verizon dealers. I believe that was sent in March or April of 2010. In April of 2010, Beeper Vibes was sent a mall map for Sawgrass Mall, the largest mall among the malls that Beeper Vibes entered, indicating that there was already a Best Buy mobile at that location. After that time, in July of 2010, Beeper Vibes executed its leases and entered the property. They then maintained, they signed two leases, the Boynton Beach lease and the Coral Square lease. They then maintained that almost immediately thereafter, as Mr. Reiling said, Best Buy mobile entered those two malls, but what Mr. Reiling didn't tell you is that subsequent to that discovery, and we maintain that they should have known beforehand because before they entered the malls, Best Buy had put up signs indicating that they were coming into the space, but be that as it may, after learning that Best Buy mobile was in the malls, Beeper Vibes signed four more leases. They signed the Keystone Floor lease on July 20. They signed the Sawgrass Mills leases on September 16, and that was two leases. Then they signed a five-year lease with Dayland Associates in October of 2010. Let me ask you a practical question. Was Beeper Vibes already in the malls that these July leases were executed to provide the space? Were they already physically present? The presentation to the court at summary judgment was that they were physically present in two of the malls, not the other three. That's Boynton Beach and Coral Square? Boynton Beach and Coral Square. They maintained that they had come into Boynton Beach and Coral Square and that shortly after their entry into Boynton Beach and Coral Square, Best Buy mobile officially opened its locations, even though, as I said, it had posted signs for weeks beforehand indicating that it was going to be coming to the malls. So what does it mean to open your kiosk but not have signed the lease yet? How does that work? No, that's not the way it worked, Your Honor. The way it worked is that the leases were signed and then they entered into the spaces. So as we understood the evidence presented at summary judgment, Beeper Vibes signed its Boynton Beach and Coral Square leases, I believe, on July 9th of 2010, moved in shortly thereafter, and then shortly after that, Best Buy mobile officially opened its locations. And as Mr. McMurtry testified, in March of 2010 negotiations were still ongoing, but he didn't know that... I'm sure I'm missing something, but I thought the records showed that it was in June that Beeper Vibes opened kiosks in Boynton Beach and Coral Square. I believe it was July, Your Honor. Okay, so you're making the point that the opening of the kiosk and the signing of the contract is the same time. I believe that is correct. But there wasn't a dispute that Beeper Vibes had entered into those malls and that Best Buy had officially opened its malls shortly thereafter. But the reason that I say that there was no justifiable reliance relates to the fact that Beeper Vibes, A, knew two or three months before it entered those malls that Best Buy mobile was in one of those malls. And, in fact, in that mall, Beeper Vibes signed not one but two kiosk leases. Which mall was that in? That was in the Sawgrass Mall, where Beeper Vibes signed two kiosk leases in September of 2010. And the Sawgrass Mall lease is important because when I deposed Mr. Langford about his knowledge about the Sawgrass Mall, he provided evidence that demonstrates that there's no issue of material fact, that there was no fraudulent misrepresentation. Whether this is decided under Florida law or Ohio law, both states require that a fraudulent statement be made with knowledge or reckless disregard as to the truth or falsity. When I presented Mr. Langford with a mall map that he had received in April showing that Best Buy was already in that mall, his response was, well, not all Best Buys sell Verizon. So it may be that that Best Buy store didn't sell Verizon. That's consistent with Mr. McMurtry's testimony that he wasn't negotiating the Best Buy lease. He didn't know whether Best Buy sold Verizon or not, wasn't aware of their product mix, and probably wouldn't have been aware of their product mix even if he had been the one negotiating the leases. So if Mr. Langford, who was in the trade, doesn't know whether a Best Buy mobile sells or doesn't sell a lease, as a matter of law, you can't impose on Mr. McMurtry, who is just a general leasing representative, the obligation to know that. But doesn't the law in Florida include a duty to disclose that if you are asked a question, that you have to give both a full and honest and truthful answer in this context? Can you just say, hmm, don't know, didn't look? I don't know that the case law goes that far, but even if it did in this case, Judge Strange, that wouldn't result in a genuine issue of material fact here, because when I asked Mr. Beldo in his deposition what he asked Mr. McMurtry about, he said, and I quote, if there were any other Verizon dealers coming in, if there were any other big discount dealers, big dealers at all, is there any other dealers coming in that I would need to know about prior to making a decision? And that's important because both he and Mr. Langford testified that they were concerned about other Verizon locations. There's no dispute that in each of these malls, there were cell phone providers for other carriers, for AT&T, for T-Mobile, for Sprint. And B-Provides wasn't concerned about those. B-Provides testified, claimed to have been concerned about operating with a Verizon store, even though there was record evidence that B-Provides has opened and maintained kiosks in connection with other Verizon stores in the same mall in at least four other locations. But the point that demonstrates that there was no fraudulent misrepresentation here is what Mr. McMurtry was asked was if there were any other Verizon dealers coming in. And as he testified, he didn't know whether Best Buy sold Verizon. The law doesn't impose a duty on him to go track down whoever is engaged in these negotiations with Best Buy, do due diligence, ask them something that they might not even know. This is why it's so important to enforce merger and integration clauses, particularly among sophisticated business people like the folks at B-Provides who have been doing this for years, who had at one point 25- Counselor, you would concede, wouldn't you, that Florida law is split on whether the presence of a merger and integration clause impacts or vitiates a fraudulent inducement claim? We are aware, Your Honor, that there are decisions that say that the mere presence of a merger and integration clause does not in every circumstance vitiate a fraud claim. However, the law doesn't go as far as Mr. Reiling represents it to be. Florida law, for example, imposes on courts a duty to ensure that a fraudulent inducement is actually extraneous to the contract. That's the top case. I do not believe that was the case here. Hotels of Key Largo said that where the only alleged misrepresentation concerns the heart of the party's agreement, simply applying the label of fraudulent inducement to a cause of action will not suffice to subvert the sound policy rationales underlying the economic loss doctrine. The courts in Florida still say that a party's reliance on oral statements that are at variance with the written documents is not reasonable as a matter of law. So while it's not a complete magic bullet in Florida to have a merger and integration clause, the law doesn't allow any disappointed commercial party to a contract to come in, toss out some allegation about fraud with regard to something that's generally covered in the contract, and be able to stave off enforcement of that contract until a lengthy trial is conducted on a fraudulent inducement claim. Do you have any other points? Or we can go back to Mr. Reiling and his rebuttal time. I do have some other points. There were other rulings by the court. We believe, for the reasons that I just discussed, that the court was correct in its dismissal of the fraud claim. We believe that the court was also correct in the dismissal of Bieber-Bibes' conversion claim. At the time of summary judgment, the conversion claim was based on inadmissible hearsay. Mr. Belobo testified that he had heard secondhand from one of his employees that there was an issue at the Boynton Beach Mall when, as the record demonstrates, Mr. Belobo had employees attempt to go into the Boynton Beach Mall without informing anybody at the mall and remove a significant quantity of inventory. Apparently what happened was there was some sort of disturbance. The parties to the disturbance admittedly were not deposed, but the police came in and ceased the activity. And how did the police know to come in and seize this? Well, as I stated, none of the parties to that were deposed. It may have been that they were called by the mall, but be that as it may, Bieber-Bibes then tried to expand this into an idea that Boynton Beach utilized, was their term, utilized the Boynton Beach Police Department to work a conversion. The Boynton Beach Mall doesn't have the ability to direct and control the activities of police officers. If the police officers had come in response to a call and determined that nothing improper was going on, they'd have turned around and gone back to the station. The idea that Boynton Beach can control police activities is something that should be rejected as a matter of law. But more to the point here, the district court's ruling is correct because there was no intention to exercise dominion over Bieber-Bibes' inventory. All that Boynton Beach was doing was enforcing contract rights. They have a right to determine with respect to the property outside of the kiosk how it's going to be utilized, who's going to be allowed in, who's not going to be allowed in. If Bieber-Bibes had any remedy at all, which I believe they did not, that remedy would have been for breach of contract, and that breach of contract would have related to some improper attempt to deny access to the property. But Bieber-Bibes never brought a claim for breach of contract. They brought claims for fraud, fraudulent inducement, unjust enrichment, breach of the implied covenant of good faith and fair dealing, declaratory judgment and conversion, but they never brought any claims for breach of contract. And the reason for that is simple. Bieber-Bibes didn't want to enforce the contracts. They wanted to avoid the contracts. And so my time is nearly up, but for the reasons that we've discussed, for the reasons that are set forth in the briefs, it is the request of the defendants and the appellees and cross-appellants that this court affirm the district court's summary judgment dismissing Bieber-Bibes' claims in their entirety, that it affirm the district court's judgments in favor of Keystone and Sunrise for unpaid rents. With regard to Coral Square, we request that the court affirm in part with regard to Bieber-Bibes' liability, but reverse and remand for an entry of judgment in the amount of $223,137.41, which is the balance to which the representative of Coral testified. Thank you, Mr. McMillan. We appreciate your argument. We'll hear rebuttal from Mr. Reiling. Thank you. Thank you, Your Honor. Very briefly in regards to the representations by Mr. McMurtry, on page ID 514, it makes it clear that the judge had before him at the time of summary judgment the fact that Belbo specifically asked about other Verizon dealers and big discount dealers like Best Buy Mobile coming into the mall. McMurtry testified he had no knowledge of any such deals. Mr. Reiling, I'm just trying to make sure I'm grasping this. Let's just talk about the leases for Galleria, Sawgrass Mills, and Dadeland. Am I right in understanding that those were signed in October of 2010? Those were signed in October of the year 2010. Am I right in understanding that at the time they were signed, those malls already contained Best Buy Mobiles? They did not. Excuse me? The Best Buy Mobile locations, there was one at Sawgrass. There was also one at Coral Square and Boynton. But as indicated in the briefing, the Boynton B- So if there's one in Sawgrass, it was already there. I mean, what I'm struggling with is how can this be a material reliance interest when it seems at a minimum you have to concede that your client was signing leases knowing that at least in some of the locations there already was a Best Buy Mobile? Well, the locations that we're concerned about are the Boynton Beach and Coral Square. And at the time that B-Provides entered into those leases- No, but I don't think it works that way. I mean, I don't think you can slice it up that way. I mean, you care about this always or you care about this not at all? That's the part that's just not making sense to me. Well, maybe I can explain it economically. By the time that the later leases were signed, B-Provides had already spent the better part of a million dollars entering into the Florida market. They were there, and because of some subsequent representations of McMurtry in a conversation in July of year 2010, they tried to make a go of it and they tried to open additional locations to obtain critical mass. They would have never entered into the Florida market in the event that they knew at their two flagship malls, Boynton Beach and Coral Square, that there was going to be a Best Buy Mobile giving away the phones that they were trying to sell directly across the hall. Okay, so the Boynton Beach and Coral Square leases are signed in July of 2010. Is that correct? July. At that point, the locations are opened almost immediately thereafter and within a couple of days, Best Buy Mobile opens their locations. By that point, B-Provides had shifted from Ohio its staff and had spent the better part of a million dollars to enter into that market. They did try to make a go of it down there and could not because they literally bled money most prominently from both the Boynton Beach and the Coral Square malls. They couldn't sell phones when Best Buy Mobile was giving them away. And McMurtry was aware that this deal was in progress. In fact, Best Buy Mobile opened up numerous locations. I just want to get one other thing clear, just so I'm understanding your side of the case. Before the July leases were signed, we'll just stick with Boynton Beach to start. Before that one signed, it's your theory of the case that no one at B-Provides knew about the presence of Best Buy Mobile in Boynton Beach or, for that matter, Coral Square before those leases were signed? That's exactly correct, Your Honor. And the evidence that was presented to the court is 100% clear on that. And the court—  I'm sorry, Your Honor. I think it's important to note, and I realize I'm running out of time. It's important to note that the court made its determination on the basis of the integration clauses. It didn't address that issue. That doesn't matter. I mean, we can affirm on all kinds of grounds. Correct, Your Honor, but there's no contrary finding in the record, and there's no evidence to support the fact that B-Provides had any knowledge whatsoever prior to opening its locations in Coral Square and Boynton Beach of the existence or presence of Best Buy Mobile. Is your complaint restricted to those two places? Those two leases entered us into that market and caused the execution of the subsequent leases. But in regards to B-Provides' knowledge, there's no doubt by the time that they signed the other leases, they knew that there was a Best Buy location at Coral Square and Boynton Beach because it was right across the hall. But again, they entered into those leases in an effort to try to increase its market presence and spread around its cost. They knew Best Buy was already there or was coming in, right? Well, they knew that after entering into Coral Square and Boynton Beach and spending the money to get down to Florida, yes, by the time that they signed the Dadeland lease and the Sawgrass leases, they knew that there was a Best Buy at both Coral Square and Boynton Beach. Real briefly, in terms of a couple other issues that I... I'll let you address. Your red light's already been on, and we let you go quite a bit over the first time. So if you have one sentence with just a few dependent clauses, go for it. But otherwise, that's it. Okay. The one thing that I would like to draw the Court's attention to is in regards to the Keystone lease, assuming that Simon had actually taken this space on account of the appellant in accordance with the three-part test under Wagner, the Keystone lease provides a 60-day termination without cause, and it provides sole discretion. If they take the second option under the Wagner test, taking it on account, number one, Simon needs to account, which they never did.  And there's no authority in Florida whatsoever that would support the proposition that B-Provides does not have a right to terminate that lease upon a 60-day notice. And I realize I've gone over my time. Thank you, Mr. Reiling. Appreciate your argument. Thank you, Mr. McMillan. We appreciate yours, and thanks for accommodating everybody by doing this by phone. We appreciate it. The case will be submitted, and the Clerk may call to order.